Thank you, Your Honor. May it please the Court and Counsel, my name is Eric Rasmus and I represent Wayne Kellberg, the petitioner in this matter, our appellant, excuse me. On January 31, 2005, Mr. Kellberg was working his perfect job for the Johnson Brothers in Superior, Montana. Essentially, he was employed as a bark picker, which made essentially his job duties were to pick garbage out of a conveyor belt and, you know, move sacks of heavy pellets from point A to point B. He had been employed at that job for some time and then, unfortunately, on January 31, 2005, he was twisting to throw a log and injured his lower back. This subsequently resulted in surgery to L5S1 by Dr. Day, a neurosurgeon in the Missoula area community, Missoula, Montana community, and, of course, his surgical records can be found at pages 348 to 349. Mr. Kellberg was enjoying a good result and then, unfortunately, in July of 2005, he was helping someone change a tire on an accident and, you know, he essentially exacerbated his lower back conditions again. And those records can be found at 338 to 339. You know, since that time, he's had multiple problems to his lower back, as well as subsequently we'll talk more about, in fact, the mental impairments that have, you know, afflicted him as well. I believe the record shows that in October of 2005, he had another MRI of his lumbar spine, which showed epidural fibrosis encircling the nerve root. And on October 14, 2005, his last visit with Dr. Day, he was referred to a pain clinic and referred to a panel examination of physicians to determine other things, including, you know, MMI and restrictions, etc. Mr. Rasmussen, is it Mr. Rasmussen? Rasmussen. I know that in his, your client, in his original application for disability, he allegedly suffered from left and right heel fractures, as well as low back pain. Yes, Your Honor. But I was trying to find in the right, the heel fracture allegation and what the onset of that disability was. On June 2, 2008, he received treatment at St. Patrick's Hospital, and those records are found at 566 to 580, Your Honor. And that's where it says that he had the with respect to your client. And I think there's a question here if that constitutes significant probative evidence. And as I read the profile description, it really states that the typical characteristics of someone falling within the profile, and I'm just trying to figure out how much focus should be on the MMPI, especially when I think there was somewhere in the record that said that the claimant intentionally entered the wrong answers during the MMPI testing. So are you putting a lot of focus on the MMPI? And if so, should we? We are, Your Honor. Yes, yes. We believe that, you know, out of the entire record, this is what is the best determination of his mental impairments. The best determination? Yes, the best determination. And I believe if you look at Dr. Harrison's records, which are found at 453 to 464 in the record, conducted December 20, 2005, he did, in fact, find that they were valid. He believed the results that he obtained, not only from the MMPI, but the Beck Depression Inventory, were valid results as well. And I'm trying to find a site for you, but I'm not. But you acknowledged that, you know, the fact that the claimant intentionally entered the wrong answers during the MMPI testing. Yes, Your Honor. Yes, I believe that is part of the record. Yes. Is there any, I did not find it, but is there any indication of whether Dr. Harrison viewed that as having been a result of the personality disorder that he diagnosed or instead as a symptom of malingering? Because presumably it could be either one. No, Your Honor. He did believe that it was part of the physical mental, excuse me, mental impairments under which, you know, he was subsequently diagnosed. What was that? The fact that he had intentionally put the wrong answers was part? I'm sorry, I didn't understand what you just said. What he said is he acknowledged, Dr. Harrison acknowledged in his report that this had happened. Right. Okay. But he did not believe that it affected the validity of the results that he obtained from the testing and his subsequent diagnostic impressions. Did I answer the question? I think so. I think so. There's a mention of malingering and I'm trying to find out because it's not clear to me that Robbins really is the appropriate rule here because it looks like we have to is required to make an explicit finding of malingering before rejecting your client's pain testimony. And I think you're pointing us to Robbins. Is that right? I believe that's correct, Your Honor. All right. But aren't there some subsequent cases that shed light on that and that don't really necessarily require that there be a explicit finding? I think is it Carmichael and the show case? Can you talk to me a little bit about that? Well, you know, certainly I believe that that has been brought forth by the appellee in this matter as far as, you know, that case law. What we're urging this panel to do is look at the entirety of the circumstances. You know, in fact, the psychological profile developed by Dr. Harrison, essentially, if you look at the entirety of the record, Mr. Kelberg acted in conformity with that psychological profile throughout the entirety of the medical treatment notes. Okay. And so, while certainly, I certainly will acknowledge that Mr. Kelberg perhaps is not the most credible claimant to come before this court, if you look at other, you know, factors that are involved here and you look at the other witnesses, not only Dr. Harrison, but also Kathy Kleinkopf, the vocational expert who spent several years working on this case, trying to help Mr. Kelberg reenter the workforce, I think that you see a pattern that clearly emerges of this gentleman being unable to function in a competitive work environment, which is consistent with Dr. Harrison. ALJ also discounted that the vocational expert's testimony, right? Yes, yes he did, Your Honor. And I believe that he was not following the mandate of Social Security Rule 0603P whenever he did that, in that he did not consider the specific factors that we've mentioned in our brief in terms of length of time, you know, spent on the case by Ms. Kleinkopf, you know, this, the relationship with, you know, Mr. Kelberg that she, you know, in fact, tried to help this gentleman and went out of her way to do so by not only trying to provide testing, but also to, you know, provide him with dentures, providing his clothing, providing with housing, providing him with a multitude of things to help him succeed in his trial work-job period with the University of Montana as far as a survey taker. And so, unfortunately, you know, that job trial failed and led Ms. Kleinkopf to eventually determine that he was not competitively employable, and she made that specific determination. Ms. Kleinkopf had been, at that particular time, a vocational counselor for 30-plus years, and so, you know, her inability to help this particular gentleman get back in the workforce, I think, speaks volumes in terms of his disability. I'm trying to figure out, if the ALJ had credited the, your client's testimony or the pain testimony in full, I'm trying to figure out what the result would have been. There, I think, were a number of hypotheticals posed to the vocational expert, and I'm trying to figure out how do we know which one your client fits into without remanding to the agency for further proceedings? How do we determine that based on the vocational expert testimony? You know, Your Honor, as far as the complaints of pain, at this particular time, Mr. Kelberg was being prescribed, you know, very, you know, strong medications. I mean, the record reflects that, page 794, that Dr. Lara was prescribing MS cotton to him, you know, Vicoprofen, Lyrica, and Amitriptyline at the same time. And so, obviously, these physicians felt that he was experiencing, you know, severe pain and were prescribing for him accordingly. So, as far as the hypotheticals posed to the vocational expert, you know, certainly there was some mention in terms of inability to focus, but it did not take into account the side effects of the medications, which included the fact that he got up, took his rest, you know, mere hours after doing that. So, whenever we're looking, we believe that the hypotheticals themselves are inaccurate across the board because they do not fully account for, you know, the entire extent of what was occurring with this gentleman mentally. Did you want to save some time for rebuttal? Yes, if there's no further questions from the panel, yes. Thank you. We'll hear from Ms. Randall. Thank you. May it please the court and counsel, I'm Jennifer Randall on behalf of the Commissioner of Social Security. Unless there's somewhere else that the court would like me to start, I wanted to begin by addressing Dr. Harrison's report. As the court correctly observed, Dr. Harrison created an MMPI profile based on his one-time evaluation of Mr. Kalberg, but he also noted that Kalberg gave some exaggerated or extreme answers in completing the profile. However, he also diagnosed a personality disorder, which is uncontradicted in the record. And what seems to me to be missing is any analysis of whether, at least by the ALJ certainly, of whether a personality disorder and some of the other mental limitations or conditions that are contradicted could explain either those answers or Mr. Kalberg's behavior or his ability to work. Well, Your Honor is correct that Dr. Harrison's 2005 diagnostic impression of personality disorder and chronic pain syndrome are the only instances in the record where you see diagnoses of that type. I think it's also significant to note that during the time period at issue in this case, between May 2008 and January 2010, there are no acceptable medical sources who find that Kalberg had these conditions or, in fact, that he had any limitations in mental functioning. But with that report in hand, why didn't the ALJ have a duty to develop the record and think about whether those conditions were ones that would continue into the future? After all, if one has a personality disorder, it's my understanding it doesn't just go away, or at least it wouldn't necessarily go away. Yes, Your Honor. Well, not only was this the only instance in the record where there was such a diagnosis, but at the administrative hearing in this case, Kalberg, through his present counsel, didn't elicit any testimony about a personality disorder or chronic pain syndrome and instead focused the ALJ on the mental impairment of depression, which I think then drove the ALJ's analysis and the ALJ's focus on depression. I guess it still seems like a big question mark to me as to what effect that may have had on either these exaggerated responses or the credibility of the claimant. Well, Your Honor, with regard to the impact that these diagnoses may have had on Kalberg's functioning, I think looking back at Dr. Harrison's own report, he did not opine that Mr. Kalberg would be precluded from working because of his condition. He noted secondary gain issues. He found that Kalberg seemed to be trying to avoid his past strenuous job at the bark plant or other similar work, and he recommended alternative employment. Except I guess my concern is this. The ALJ found the claimant not entirely credible, and it seems to me that had the ALJ taken into account the possibility that he has this personality disorder and chronic pain syndrome, whether that would have affected the credibility analysis. I understand Your Honor's concern, but in this case, Kalberg was represented by counsel during the administrative proceedings. What difference does that make to the absence of an analysis of my question? Well, first of all, in Social Security cases, the claimant has the burden to prove disability, and in particular, they have the burden of establishing a impairment. They have the burden of showing whether they would have a impairment that was severe enough to meet a listing. But in this instance, the ALJ had the obligation to give clear and convincing reasons if he found the claimant's subjective pain testimony not fully credible. And so I'm really asking about that. In light of this report, how are his reasons clear and convincing when they don't take that into account? Well, Your Honor, the ALJ gave a number of different reasons for discounting Kalberg's credibility. Some of them did go to the issue of symptom exaggeration, the difference between Kalberg's report that he was disabled and his own treating doctor's repeated finding that he had abilities consistent with light work, and discrepancies between Kalberg's report of a disabling mental impairment and the record. But he also made findings such as the fact that Kalberg had a sporadic work history. It appears that Kalberg worked for a number of years but only rarely reported income. And these findings, I think, remain valid regardless of the diagnoses of personality disorder. I also think that it's difficult to judge the ALJ for not considering a diagnosis that was not advocated by a claimant through his counsel in the diagnosis of this particular impairment in an extensive record and that exceeded the relevant time period in the case by a matter of several years. There can be numerous diagnoses which appear only once in a claimant's medical records and to require an ALJ to independently go through the record and make finding of all possible impairments in the record regardless of what the claimant's counsel is advocating in the case, I think, is unduly burdensome and just something that's going to further slow down a system where we're already facing tremendous burdens and limitations in resources. What do we do or what do you do with Robbins? I mean, did the ALJ make the requisite finding under Robbins? Do we follow Robbins? Well, Your Honor, I think that Carmichael is the more recent and controlling case. And in Carmichael, the court recognized that an ALJ doesn't have to make an explicit finding of malingering. In this case, the ALJ discussed evidence which constitutes evidence of malingering. The ALJ is the finder of fact in this case and regardless of whether the evidence could be interpreted differently, the court should defer to its credibility. The footnote one in Carmichael, though, is really dictum. It makes an inconsistent cases, one of which is Robbins, but then says this isn't a case about malingering because not only is there no finding, there's no malingering. So it really, I mean, it was an interesting aside, but I'm not sure what you're asking us to make of it. Well, I mean, I think that an ALJ doesn't have to use the magic word of describe malingering. And I know you don't think the ALJ had to do this, but is it possible that behavior that is consistent with malingering could also be consistent with a personality disorder and chronic pain syndrome? That's possible, Your Honor. And in this case, we also have evidence of drug magnification could be consistent with his desire to obtain narcotic pain medication regardless of his actual symptoms. There are a number of possible factors that could possibly influence a claimant's behavior. The ALJ was responsible for resolving factual conflicts in the case. Right, but didn't explicitly consider one of the alternatives. The ALJ did not explicitly consider that alternative, although I would again note that it was not brought to its attention by counsel. Let me ask you a hypothetical question here. Assuming, and I know you don't want us to find this, but assuming that we were to conclude that the ALJ should have given more attention to the Harrison report, would a remand for further consideration be the appropriate response or would a remand for payment of benefits be the appropriate response? Your Honor, I think that the appropriate response, although I would not agree with that result, would be remand for further proceedings. And there are a few reasons that I say that. First of all, under this Court's precedent, remand for an award of benefits is only appropriate not only where an ALJ has improperly evaluated evidence, but also where there are no outstanding issues in the case. And it's clear from the record that the claimant would have to be found disabled if the improperly discounted evidence were credited as true. In this case, Dr. Harrison's report pertained to mental impairments and the ALJ, having found that depression was not a severe impairment, ended his analysis of mental impairments at step two. So further proceedings would be necessary to resolve that outstanding issue and continue with the sequential evaluation. Moreover, Dr. Harrison's report, as we've discussed, was issued several years before the relevant time period in this case. Although he diagnosed or made a diagnostic impression of personality disorder, he didn't opine that Kellberg would be precluded from working. And so even if his report were credited as true, it wouldn't be clear that an ALJ would be required to find the claimant disabled. Nor even that he would be required to find him credible, even if he had to reconsider that question. That's correct, Your Honor. If the court does not have any further questions on that topic, then I would like to address Ms. Kleinkauf's report, the report and opinion of the vocational rehabilitation counselor. The ALJ considered her report in his decision, but made several valid findings regarding the report. First, he correctly observed that a vocational counselor cannot give a medical opinion. The regulations distinguish between acceptable medical sources, like psychologists and doctors, and other sources, like vocational counselors. And only acceptable medical sources can give medical opinions or be considered treating sources whose medical opinions might be eligible for controlling weight. The ALJ also correctly observed that Ms. Kleinkauf's opinion regarding competitive employability goes to the ultimate issue of disability, which is reserved to the commissioner. And the ALJ reasonably found that Ms. Kleinkauf's opinion, if it were interpreted to impact or relate to Kellberg's mental functioning, would be contradicted by her own prior observation that Kellberg was able to do quite well in adult education classes. And so the ALJ properly discounted that opinion from Ms. Kleinkauf. As I previously stated, there were no opinions from acceptable medical sources finding that Kellberg had limitations in mental functioning during the time period at issue in this case. To the contrary, his treating doctor found that his depression was in remission with treatment. And unless there are no further questions from the panel, I was going to direct the court to the commissioner's brief and ask that the court affirm the ALJ's decision finding Kellberg not disabled under the act. Thank you. Thank you, counsel. Mr. Rasmussen, you have some time remaining for rebuttal. Thank you, Your Honor. I did find the citation at the record at page 459 regarding Dr. Harrison's finding that the MMPI or results of the MMPI, too, were valid. And also, I would direct this panel's attention to page 460 of his report, which talks about persons with a psychological profile like Mr. Kellberg's who have poor memory, concentration deficits, poor decision making skills, lack of energy, emotional alienation, somatic complaints, unusual thinking, bizarre perceptions, and engaging in fantasy, not certainly someone who is able to compete in a competitive work environment. Once again, we would like to or I would like to express that I believe Dr. Harrison's report and findings were somewhat prophetic whenever it was presented in a real-world type of setting underneath the supervision of Kathy Kleinkopf, where in fact, you know, he was in an accommodated work environment provided with accommodations as far as an elevator, you know, specific instructions from his supervisor, where he was unable to conduct surveys reading off a script. Those were his entire job duties and was unable to fill them, despite the fact the record shows that he really tried to do this job and was very upset whenever he was unable to do it. You know, one parallel I did not draw in this case before today is that the window incident that was mentioned earlier, whenever he tried to commit suicide by jumping out of the window in June of 2008 coincided with the time whenever Ms. Kleinkopf withdrew her services for vocational rehabilitation. And so, you know, I believe the two are interrelated. He had failed at this particular job trial. He really tried to make an effort to make this thing work and it didn't. And so, we believe that it's clear that we're asking this panel to please remand and remand with benefits. And that's all I have. Thank you, counsel. Thank you. The case just argued is submitted and we appreciate your arguments.
judges: Tashima, Graber, Murguia